DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a judgment of the Williams County Court of Common Pleas which granted summary judgment in favor of defendant-appellee, Continental General Tire Company ("CGT"), in an employer intentional tort action filed by plaintiff-appellant, Julia Schriner. Schriner's appeal now raises the following assignments of error:
 {¶ 2} "Assignment of Error No. 1
 {¶ 3} "The trial court erred in granting the appellee's motion for summary judgment because the trial court failed to follow the appropriate standard for reviewing such a motion.
 {¶ 4} "Assignment of Error No. 2
 {¶ 5} "The trial court erred in granting appellee's motion for summary judgment because the evidence unquestionably established a genuine issue of fact requiring resolution by appellant's constitutional right to a jury trial."
 {¶ 6} The undisputed facts of this case are as follows. CGT is a manufacturer of large tires. In the manufacture of those tires, CGT first creates bladders with a bladder press machine. The bladder press consists of various sections that sit in two connecting pits at the CGT plant in Bryan, Ohio. The two pits, the valve pit and the press pit, have been described as the short and deep ends of a swimming pool respectively, although there is no slope between the two pits. The bladder press sits in the press pit which is approximately 25 feet deep. The valve pit contains four hydraulic valves which open and close during the operation of the bladder press to create the hydraulic pressure necessary to bring the two sections of the bladder press together to form a tire bladder. The valve pit is approximately four feet deep.
 {¶ 7} The valves, manufactured by defendant Valv-Trol, are approximately 33 inches long and are capped by a diaphragm which is 20 inches in diameter. They further contain a piston that is four inches in diameter and is surrounded by packing. The bottom of the valve is then capped by a plate. In June 1996, two of the valves in the valve pit were positioned with their diaphragm's facing up, the "down" valves, and two were positioned with the diaphragm's facing down, the "up" valves.
 {¶ 8} On June 5, 1996, Thomas Schriner was employed as a maintenance mechanic at CGT's Bryan plant. During his shift, Schriner, Neal Johnson and their supervisor, Dean Smith, responded to a report that the bladder press was leaking. Upon investigation, they found that the press had a massive oil leak that almost filled the valve and press pits with water and hydraulic fluid. Witnesses estimated that together, the pits held approximately 8,000 gallons of fluid. After the press completed its last cycle, the maintenance mechanics removed the cover plate from the valve pit and drained the fluid from the pits in an attempt to locate the leak. Schriner then climbed into the valve pit and straddled one of the valves to get a closer look at the system. With Schriner in the valve pit, Smith activated the press at low pressure, but that did not recreate the leak. Smith then increased the pressure to raise the press halves together. As the pressure gauge reached 2,200 p.s.i., Smith switched the press from the automatic mode to manual. At that point, he heard an explosion. The valve in the valve pit, over which Schriner was straddled, failed as the piston fractured, shot out of the valve housing and struck Schriner, killing him instantly.
 {¶ 9} Subsequently, plaintiff-appellant, Julia Schriner, the widow of Thomas Schriner, filed the instant action against CGT in which she alleged that the injuries sustained by her husband were the result of the intentional and tortious conduct of CGT. Appellant also brought claims against numerous other entities involved in the manufacturing and rebuilding of Valv-Trol valves and/or the bladder press. During the proceedings below, all of appellant's claims against the manufacturing defendants, as well as numerous cross-claims filed by the various parties, were dismissed upon appellant's settlement of a number of those claims. Thereafter, only appellant's claim for employer intentional tort against CGT remained, and on March 27, 2002, CGT filed a motion for summary judgment on that claim. CGT based its motion on the deposition testimony of Mark Fujka, CGT's safety manager, Paul Ruble, CGT's facilities engineer, Ken Ingram, the president of Valv-Trol, Dean Smith, and appellant's expert, James Watson, as well as the affidavit of Mark Fujka. CGT asserted that based on this evidence, appellant's claim against CGT fails under all three prongs of the common law standard for an employer intentional tort.
 {¶ 10} Appellant responded with a memorandum in opposition supported by the same evidence cited by CGT as well as the depositions of Dr. John Moats, who performed an autopsy of Thomas Schriner, Dr. Albert Karvelis, a mechanical engineer and another of appellant's expert witnesses, Ron Durbin, the president and owner of Durbin Industrial Valve, Inc., David Strait, the supervisor of the curing department at the time of the accident, and Neal Johnson. In addition, appellant submitted the affidavits of Jim Hornyak, Howard Cooley and John Colbart, who were all employees in the maintenance department at CGT on or before June 5, 1996. Appellant's memorandum in opposition focused on evidence that in 1990, CGT had experienced a similar valve failure of a Valv-Trol valve in the valve pit and had done nothing thereafter to prevent a subsequent failure. CGT responded with a reply brief in support of its motion for summary judgment, which asserted that after the 1990 valve failure, the valve was inspected by Valv-Trol, its manufacturer, who gave CGT its assurances that such a failure was rare. Accordingly, CGT asserted that appellant had presented no evidence that CGT knew that if Schriner was exposed to the valve then injury to him was a substantial certainty.
 {¶ 11} On May 6, 2002, the lower court filed a decision and judgment entry granting CGT's motion for summary judgment and dismissing appellant's claim. In granting the motion, however, the court held: " In the matter herein, the Court specifically finds that plaintiff has not identified a genuine issue of fact for trial under the substantial certainty standard of Fyffe. Whereupon, the Court adopts the law and argument of defendant CGT in its entirety and, specifically, that contained in CGT's reply brief in support of its motion for summary judgment filed April 19, 2002." It is from that judgment that appellant now appeals.
 {¶ 12} We will first address appellant's second assignment of error in which she asserts that the trial court erred in granting CGT summary judgment. In reviewing a trial court's ruling on a summary judgment motion, this court examines the case de novo. Conley-Slowinskiv. Superior Spinning Stamping Co. (1998), 128 Ohio App.3d 360,363. To prevail on a motion for summary judgment, the movant must demonstrate that there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the nonmoving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). The party moving for summary judgment under Civ.R. 56 bears the burden of showing that there is no genuine issue of material fact on the essential elements of the nonmoving party's claim. Dresher v. Burt (1996), 75 Ohio St.3d 280,293. If the moving party satisfies this burden, the nonmoving party has a reciprocal burden, as outlined in Civ.R. 56(E), to set forth specific facts showing that there is a genuine issue for trial. Id.
 {¶ 13} The standard for establishing a common law intentional tort in the context of an employer/employee relationship was first enunciated in Blankenship v. Cincinnati Milacron Chemicals (1982), 69 Ohio St.2d 608. In such a context, the Supreme Court of Ohio has defined an employer intentional tort as "an act committed with the intent to injure another, or committed with the belief that such injury is substantially certain to occur." Jones v. VIP Dev. Co. (1984), 15 Ohio St.3d 90, paragraph one of the syllabus. Accordingly, the focus in Blankenship and its progeny is on the proof required to establish intent for the purpose of showing that an employer committed an intentional tort against its employee. See, e.g.Van Fossen v. Babcock Wilcox Co. (1988), 36 Ohio St.3d 100.
 {¶ 14} In Fyffe v. Jeno's, Inc. (1991), 59 Ohio St.3d 115, paragraph one of the syllabus, the Supreme Court of Ohio identified the following three elements that an employee must prove to establish an employer intentional tort: "(1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task."
 {¶ 15} In setting forth the proof required to establish intent, the Fyffe court held that "mere knowledge and appreciation of a risk — something short of substantial certainty — is not intent." Id. at paragraph two of the syllabus. Rather, it must be shown that the probability of certain consequences is such that the "employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds * * *." Id. Only in these circumstances, will intent be inferred from the employer's knowledge of all the facts and circumstances which create the risk.Emminger v. Motion Savers, Inc. (1990), 60 Ohio App.3d 14, 16-17.
 {¶ 16} Accordingly, to withstand a motion for summary judgment, the injured employee must set forth specific facts that raise a genuine issue as to each part of the Fyffe three prong test. See Van Fossen, supra at paragraph seven of the syllabus.
 {¶ 17} In support of its motion for summary judgment, CGT presented the following facts to the lower court by way of depositions and an affidavit. The Valv-Trol valves at issue in this case were manufactured in 1966. In December 1990, CGT experienced a valve failure in the valve pit when one of the Valv-Trol valves fractured. When that failure occurred, the decking was covering the valve pit and the explosion damaged the decking but did not injure anyone. An incident report revealed that the fracture occurred when an employee pressed the button to lower the mold in the bladder press. CGT then sent the damaged valve back to Valv-Trol for inspection. In a letter to CGT dated January 23, 1991, Kenneth Ingram, the president of Valv-Trol, stated that "The internal part that failed was the C-1156 Piston, which is a hardened stainless steel part * * *. The cause of failure was a fatigue crack that had progressively gotten worse over it's 2-1/2 year life, until the part was sufficiently weakened to the point of tensile failure. The crack had started at an undercut in the part which had been machined originally with an undersized radius, which created an area of stress concentration. Since this piston was somewhat defective from the start, we will replace it at no charge. * * * This failure is extremely rare for this valve, so we feel this is a very isolated case." Ken Ingram testified that the piston that failed in 1990 had been installed in a Valv-Trol valve by Durbin Industrial Valve, Inc. in 1988, and shipped back to CGT. Durbin repairs and rebuilds industrial valves. Ingram further stated that it was impossible to tell when the piston involved in the 1990 fracture was manufactured. He could only tell from his records that the piston was sold to Durbin in 1988. With regard to CGT's use of the valve, Ingram testified that CGT used the valve in an appropriate manner and application.
 {¶ 18} After the 1990 valve failure, and upon receiving the inspection report from Ken Ingram, CGT did not seek to have the remaining valves inspected to determine if the pistons were similarly defective. Rather, CGT relied on Ingram's assertion that the failure was "extremely rare." Dean Smith, Thomas Schriner's supervisor at the time of the accident, testified that he recalled the 1990 valve failure but never considered the valves to be hazardous after that failure. Specifically, Smith testified: "I felt that if there was a hazard problem within, the manufacturer would certainly notify us that there was a problem and to take a look at it. Whether they notified me or the engineering department or whoever, they would have told somebody to take a look at it." He then stated that to his knowledge, Valv-Trol never represented that the valves were hazardous. In this regard, Smith further testified that if he had been in the pit, he would not have been concerned for his safety, that he did not order Schriner to go into the pit and that the only reason Schriner was in the pit instead of him was that Schriner got to the pit first.
 {¶ 19} Following the 1996 valve failure that killed Thomas Schriner, OSHA conducted an investigation of CGT's Bryan facility. In a letter of December 5, 1996, to Mark Fujka, CGT's safety manager, OSHA stated that its investigation disclosed the following hazard: "An employee(s) exposed to fatal injury(s), such as, being struck by a fractured valve piston while checking for leak(s) in the hydraulic system which operates the McNeil Bladder Press." Nevertheless, OSHA declined to issue a citation for this hazard. Rather, OSHA recommended that CGT voluntarily take the following steps to reduce or eliminate its employees' exposure to the noted hazard: "1. Install pressure relief system such as needed. 2. Install pressure gauge(s) to monitor pressure of valves located in the valve pit. 3. Calibrate gauge(s) as recommended by the manufacturer."
 {¶ 20} CGT further submitted the deposition of appellant's own expert witness, James Watson, in support of is motion for summary judgment. Watson is a principal engineer at Pressure Sciences and an expert in design analysis, dynamic evaluation of hydraulic systems and the safety considerations associated with those systems. After the Schriner accident, Watson inspected the bladder press and hydraulic system at CGT as well as the failed valve and fractured piston. He subsequently submitted a report of his findings to appellant's counsel who shared the report with CGT. In that report, Watson opined that the valve failure occurred due to a fatigue crack in the piston which slowly grew larger over time. Watson identified four factors as contributing to the accident: defective design and manufacture of the valve piston by Valv-Trol, inadequate maintenance instructions provided to CGT by Valv-Trol, improper valve reconditioning in October 1992, and CGT's disregard for the safety of its maintenance employees after the 1990 failure demonstrated that the valve pistons were defective.
 {¶ 21} Watson was subsequently deposed regarding this report. In his deposition, Watson admitted that after the 1990 failure, it was appropriate for CGT to rely on the information it received from Valv-Trol in regards to its future operation and Watson knew of no evidence that the 1990 failure was anything other than an extremely rare failure or an isolated case. Watson further discussed evidence that the valve that failed had been reconditioned in 1992 by Cor-Val, Inc. and/or Midwest Valve Parts Supply Co. Watson stated that CGT had requested that the valve be reconditioned to "as-new" condition, that CGT had every right to believe that when the valve was returned from Cor-Val and Midwest that it was free from defects, and that after receiving the valve back from Cor-Val and Midwest, CGT was justified in placing the valve back into service. Watson, therefore could not articulate any safety standard that CGT violated with respect to the accident. Nevertheless, Watson did state that if CGT had inverted the valves so that the diaphragms were facing up, the piston would have shot downward and exited the valve in that direction, not injuring Schriner.
 {¶ 22} Based on this evidence, CGT argued in its summary judgment motion that construing the facts in a light most favorable to appellant, reasonable minds could only conclude that CGT had no knowledge of a dangerous condition within its business operation and did not know that an injury to Schriner or any other employee was substantially certain to occur while repairing the valve systems.
 {¶ 23} In response to CGT's summary judgment motion, appellant filed a brief in opposition that was supported by additional depositions and affidavits. Appellant's brief focused on evidence that CGT failed to take corrective measures after the 1990 valve failure to ensure that employees would not be harmed in the event of a subsequent failure. Affidavits submitted by appellant revealed that following the 1990 valve failure, two CGT maintenance employees, Howard Cooley and John Colbart, specifically asked a Mr. Bagley, who was then CGT's safety director, to build a cage over the valves and/or that the valves be inverted so that in the event of a subsequent valve failure, valve parts would be contained or shoot into the pit. Both Cooley and Colbart attested that despite their requests, no modifications were made to the valve pit prior to Schriner's accident. It was further undisputed that, after learning that the piston that fractured in the 1990 incident was defectively manufactured, CGT did not have the remaining valves inspected and continued to run the bladder press as it had done prior to the valve failure. Nevertheless, Paul Ruble, CGT's facilities engineer, testified that, prior to Schriner's accident, he knew that maintenance employees would have to work in the valve pit with the cover off to perform maintenance operations. Ruble further admitted that a fracture of a valve could be a hazard to anyone in or around the valve pit. Construing this evidence in a light most favorable to appellant, we must assume that CGT had knowledge of a dangerous condition within its business operation.
 {¶ 24} Appellant further alleged that evidence supported its assertions that CGT ran the valves until they failed without any preventative maintenance program in place to regularly determine the safety of the valves, that CGT tampered with the pressure safety devices attached to the hydraulic system and ran the press even though it was malfunctioning, and that CGT failed to follow industry standards for troubleshooting hydraulic leaks. Appellant asserted that this evidence supports a conclusion that CGT knew that if its maintenance employees were required to climb into the valve pit to work on the valves, they were substantially certain to be injured. In support of these assertions, appellant submitted the following evidence.
 {¶ 25} Paul Ruble testified that CGT had no preventative maintenance program for the valves and that CGT did not maintain records of when valves were worked on. Ruble was nevertheless surprised to learn, when all of the Valv-Trol valves were inspected after the 1996 failure, that all of the valves leaked and had various cracks and functioning problems. Ruble further discussed changes made to the pressure relief system in January 1996. CGT had been experiencing problems with the up ram of the bladder press for some time. Evidently, the system was not reaching the desired 3,000 p.s.i fast enough. Bladders, therefore, had to be scrapped. To correct the problem, it was determined that an additional pump needed to be added to the system. Accordingly, in January 1996, CGT added an additional pump to the system. Ruble testified that he believed the relief valves, which could not be adjusted to higher than 3,000 p.s.i., and the pressure gauges would prevent an over pressurization if the pump was added. Neal Johnson, however, testified that in January 1996, Ruble told him to increase the pressure relief valve to higher than its normal setting. Johnson increased the pressure and tagged the relief valve. That the tag reads: "Relief valve was set higher until new pump assy [sic] is all set up. Need to adj [sic] CCW [sic] when testing is done per Paul Ruble 1-8-96. N.J." That tag was still on the relief valve in June 1996, when the Valv-Trol valve failed, and there is no evidence that the relief valve pressure was ever decreased after the installation of the new pump. Nevertheless, there is no evidence as to what level the pressure relief valve was set in January 1996.
 {¶ 26} Appellants further submitted the deposition of an expert witness, Dr. Albert Karvelis, in support of their brief in opposition to summary judgment. Dr. Karvelis testified that he inspected the valves and bladder press system several days after the Schriner accident and that, in his opinion, the valve failed due to over pressurization. He based his opinion on evidence that maintenance employees were trying to create a geyser in order to detect a leak in the system. The pressure relief valve, however, was "cranked in," thereby disabling the pressure switch and allowing the system to exceed 12,000 p.s.i. when the two metal sections of the mold in the bladder press came together. The pressure relief valve to which Karvelis refers is the relief valve referred to above which Neal Johnson tagged in January 1996.
 {¶ 27} Appellant further submitted evidence that in the weeks leading up to the Schriner accident, CGT continued to run the bladder press despite the fact that they were having trouble raising the ram. This culminated in the massive accumulation of oil and water in the valve and press pits on the day of Schriner's accident. Once faced with the massive leak, CGT employees failed to follow industry lockout-tagout procedures to detect the leak but, rather, removed the cover from the valve pit and operated the press to recreate the leak. Karvelis, however, did testify that under the circumstances, lockout-tagout procedures would not have worked to detect the leak. Nevertheless, Karvelis did state that alternative safe procedures could have been used to detect the leak but that CGT employees had not been instructed in those procedures. Finally, Karvelis testified that under the circumstances, CGT's conduct was at most reckless.
 {¶ 28} Based on the above evidence, appellant asserted that CGT chose to expose its employees to a substantial certainty of harm in its operation of an unsafe and hazardous bladder press.
 {¶ 29} Upon review of the undisputed facts submitted to the court below, and construing those facts in a light most favorable to appellant, we must conclude that reasonable minds could only conclude that CGT was entitled to judgment as a matter of law. Under either theory of what caused the accident, the evidence does not support a finding that CGT knew to a substantial certainty that injury to Schriner or any other maintenance employee was substantially certain to occur.
 {¶ 30} If the valve failure was due to a manufacturing defect in the piston, which appellant alleges CGT should have discovered after the 1990 incident, all evidence indicates that CGT had the valve reconditioned in 1992 to "as new" condition. Both experts, Watson and Karvelis, testified that CGT had every reason to expect the valve to be in like new condition after it was returned from being reconditioned in 1992. While CGT's failure to maintain and inspect the valves through a regular maintenance program may, in hindsight, seem negligent or even reckless following the 1990 valve failure, we cannot find that such failure amounted to a substantial certainty of injury in light of undisputed evidence that Valv-Trol did not provide a maintenance program for the valves and assured CGT that the 1990 failure was rare. Appellant's own expert witness, James Watson, testified that after the 1990 failure, it was appropriate for CGT to rely on Valv-Trol's assurances that the failure was extremely rare. To the extent that the 1990 failure notified CGT that such valve failures could occur, we note the following observation by the Supreme Court of Ohio in Van Fossen, supra at 117: "There are many acts within the business or manufacturing process which involve the existence of dangers, where management fails to take corrective action, institute safety measures, or properly warn the employees of the risks involved. Such conduct may be characterized as gross negligence or wantonness on the part of the employer. However, in view of the overall purposes of our Workers' Compensation Act, such conduct should not be classified as an `intentional tort' * * *." Accordingly, reasonable minds could not conclude that CGT knew to a substantial certainty that, due to the valve defect, harm to Schriner or other CGT maintenance employees was substantially certain to occur.
 {¶ 31} We further conclude that, if the valve failure was due to an over pressurization, appellant has not established knowledge on the part of CGT that harm to its maintenance employees was substantially certain to occur. Assuming, as we must, that the relief valve setting created a hazardous condition when combined with the newly installed pump, there is nothing to indicate that the failure to return the relief valve to its proper setting, after the installation of the pump in January 1996, was anything other than negligent, or at the most reckless. Neal Johnson testified that he was not concerned about the increased pressure because he was assured by CGT engineers that the system could handle the extra pressure. Similarly, Paul Ruble, the facilities engineer, testified that there were other relief devices throughout the bladder press system that would relieve any over pressurization problem. Given this evidence, we cannot say that CGT was substantially certain that an injury would occur to Schriner or any other maintenance employee in the event of an over pressurization of the system.
 {¶ 32} Accordingly, given the undisputed evidence in the case, and construing that evidence in a light most favorable to appellant, we cannot say that the trial court erred in granting CGT summary judgment on appellant's claim of employer intentional tort. The second assignment of error is therefore not well-taken.
 {¶ 33} In her first assignment of error, appellant asserts that the trial court applied the wrong standard in ruling on her summary judgment motion by adopting, in its entirety, the law and argument set forth by CGT in its brief and reply brief.
 {¶ 34} The standards for evaluating a summary judgment are set forth above. While we find that it was inappropriate for the trial court to adopt CGT's law and argument as the decision of the court in ruling on CGT's motion, we note that our review of a trial court's ruling on a summary judgment motion is de novo. Because we have found, based on the evidence presented below, that the trial court properly granted summary judgment to CGT, the method by which it chose to do so was harmless. The first assignment of error is therefore not well-taken.
 {¶ 35} On consideration whereof, the court finds that substantial justice has been done the party complaining and the judgment of the Williams County Court of Common Pleas is affirmed. Court costs of this appeal are assessed to appellant.
 JUDGMENT AFFIRMED.
Peter M. Handwork, P.J., Mark L. Pietrykowski, J., and George M. Glasser, J. JUDGE CONCUR.
Judge George M. Glasser, retired, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.